15 So.3d 327 (2009)
Robert J. YOUNG, Jr., Husband of and Anne S. Young
v.
UNITED STATES AUTOMOTIVE ASSOCIATION CASUALTY COMPANY
Robert J. Young, Jr., Husband of and Anne S. Young
v.
United Services Automobile Association
Robert J. Young, Jr., Husband of/and Anne S. Young
v.
United Services Automobile Association Casualty Company.
Nos. 2007-CA-1590, 2007-CA-1591, 2007-CA-0543.
Court of Appeal of Louisiana, Fourth Circuit.
June 10, 2009.
*328 Robert J. Young III, Young, Richaud & Myers, LLC, Metairie, LA, and The Young *329 Firm, New Orleans, LA, for Plaintiffs/Appellees.
James R. Nieset, Jr., Michael J. Madere, Ralph J. Aucoin, Jr., Hoy Hughes, Porteous, Hainkel & Johnson, LLP, New Orleans, LA, for United Services Automobile Association.
(Court composed of Judge JAMES F. McKAY, III, Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR., Judge DAVID S. GORBATY, Judge EDWIN A. LOMBARD).
MICHAEL E. KIRBY, Judge.
In this consolidated appeal, the defendant, United Services Automobile Association ("USAA" or "insurer") appeals the granting of a judgment notwithstanding the verdict ("JNOV") in favor of the plaintiffs, Bob and Anne Young ("the Youngs").[1] Because we find the trial court erred in granting the JNOV, we reverse and reinstate the jury's verdict.
USAA issued a policy of homeowner's insurance to the Youngs for their house located on the Gulf Coast in Pass Christian, Mississippi. The insurance policy, an "all risk" policy covering all perils to the Youngs' home except those specifically excluded, provided a limit of $353,000.00 for the dwelling and a limit of $264,750.00 for damage to personal property (contents).
The Youngs' home, built upon a number of brick piers, was destroyed during Hurricane Katrina. A factual dispute arose between the Youngs and USAA as to whether wind or storm surge (water) forced the house off of its piers. After submission of the Young's claim and an investigation, USAA paid the Youngs $17,329.22 for the dwelling, $15,494.37 for the contents, and $35,300.00 for other structures. These amounts, USAA determined, covered the damages to the Youngs' property caused by wind.
At trial, the parties presented expert and factual witness testimony as well as photographic evidence. After the presentation of evidence, the trial court submitted the following six (6) Interrogatories to the jury:
1. Do you find that USAA failed to pay for any damage to the plaintiffs' house caused by the wind or a combination of wind and water?
Yes: _____ No: _____
If yes, please proceed to number 2. If no, please proceed to number 5.
2. What amount of money do you find USAA failed to pay for damage to the *330 plaintiffs' house caused by wind or a combination of wind and water?
$ ________
3. Do you find that USAA failed to pay for any damage to the plaintiffs' contents caused by the wind or a combination of wind and water?
Yes: _____ No: _____
If yes, please proceed to number 4. If no, please proceed to number 5.
4. What amount of money do you find USAA failed to pay for any damage to plaintiffs' contents caused by wind or a combination of wind and water?
$ ________
5. Do you find by clear and convincing evidence that USAA is liable to the plaintiffs for punitive damages because it lacked a legitimate or arguable basis and was grossly negligent rendered a willful, wanton or reckless disregard for the rights of the Youngs in failing to pay for damage to the plaintiffs' other structures?
Yes: ______ No: ______
If yes, please proceed to number 6. If no, please sign the bottom of this form and return to the courtroom.
6. What amount of money do you award in punitive damages?
$ ________
The jury responded "Yes" to the first interrogatory and thus proceeded to interrogatory number two, responding with the sum of $123,500.00 for the amount of money USAA failed to pay for damage to the Youngs' house caused by wind or a combination of wind and water. The jury then answered "No" to the third interrogatory and awarded no additional damages for the Youngs' contents in response to the fourth interrogatory. As to punitive damages, the jury responded "No" to the fifth interrogatory, pretermitting an answer to the sixth interrogatory.
On February 2, 2007, the trial court rendered a judgment in accord with the jury's verdict, awarding the sum of $123,500.00 in favor of the Youngs and against USAA. Thereafter, the Youngs filed a motion for JNOV pursuant to La. C.C.P. art. 1811. On August 13, 2007, the trial court rendered a JNOV, awarding the Youngs damages in the amount of $374,150.41, plus judicial interest thereon from the date of judicial demand.

DISCUSSION
The issue in this appeal is whether the trial court properly granted the JNOV. The Louisiana Supreme Court in Scott v. Hospital Service District No. 1 of Parish of St. Charles, 496 So.2d 270 (La. 1986) and in Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La. 1991), set forth the criteria to be used in determining when a JNOV is proper:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Scott, supra. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
Anderson, supra, at 832
In Davis v. Lazarus, XXXX-XXXX, p. 8 (La.App. 4 Cir. 3/8/06), 927 So.2d 456, 461, *331 we cited Anderson, supra, for the appellate standard of review of a JNOV, stating:
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.
In ruling on a motion for JNOV, a court may not weigh the evidence or substitute its judgment for that of the jury. In re New Orleans Train Car Leakage Fire Litigation, XXXX-XXXX, p. 6 (La.App. 4 Cir. 4/20/05), 903 So.2d 9, 15; Coleman v. Deno, 99-2998, p. 22 (La.App. 4 Cir. 4/25/01), 787 So.2d 446, 465.
The Youngs argue that the trial court properly granted the JNOV because the jury's verdict was inconsistent with the facts and evidence presented at trial. They claim the jury erred in awarding $123,500.00 for additional wind damage to the house, yet none for the loss of their contents, because, but for the wind shifting the house off its foundation and onto the ground, water would not have entered the structure, destroying the contents therein. The Youngs further contend that the jury should have awarded the full policy limits to them once it answered "Yes" to the first interrogatory given the undisputed evidence that the house was a total loss. They point out that no evidence was presented at trial which supports the jury's finding that their home sustained exactly $123,500.00 in wind damage above and beyond the net sum of $17,329.22 already paid by USAA.
Mississippi substantive law applies to this case.[2] Under Mississippi law, the insurer has the burden of proving what portion of the total loss was attributable to water damage and was thus within the water damage exclusion of the policy. Leonard v. Nationwide Mutual Insurance Co., 438 F.Supp.2d 684, 694-95 (S.D.Miss. 2006), citing Commercial Union Insurance Co., v. Byrne, 248 So.2d 777 (Miss. 1971). "[W]here the insured property sustains damage from both wind (a covered loss) and water (an excluded loss), the insured may recover that portion of the loss which he can prove to have been caused by wind." Leonard, supra, 438 F.Supp.2d at 695, citing Grace v. Lititz Mutual Insurance Co., 257 So.2d 217 (Miss.1972). "To the extent property is damaged by wind, and is thereafter also damaged by water, the insured can recover that portion of the loss which he can prove to have been caused by wind, but the insurer is not responsible for any additional loss it can prove to have been later caused by water." Id., citing Lititz Mutual Insurance Co., v. Boatner, 254 So.2d 765 (Miss.1971).
As to the determination of the amount of damages, the Mississippi Supreme Court has explained:

*332 ... [W]here it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages. This view has been sustained where, from the nature of the case, the extent of the injury and the amount of damage are not capable of exact and accurate proof. Under such circumstances, all that can be required is that the evidencewith such certainty as the nature of the particular case may permitlay a foundation which will enable the trier of facts to make a fair and reasonable estimate of the amount of damage.

Cain v. Mid-South Pump Co., 458 So.2d 1048, 1050 (Miss.1984), citing 22 Am.Jur.2d Damages § 25 (1965) (emphasis added).
Considering the USAA insurance policy at issue and applying Mississippi substantive law to this case, the Youngs may recover only that portion of damages which they proved was caused by wind. Furthermore, USAA is not responsible for any additional loss it proved was later caused by water. After reviewing the record, we find ample evidence was presented at trial from which the jury could conclude that both water and wind contributed to the destruction of the Youngs' home and the contents therein, and, therefore, the jury properly exercised its discretion in estimating the actual amount of damages.
Joel Dane Wehrman testified at trial as an expert mechanical engineer. USAA hired Jade Engineering, Mr. Wehrman's employer, to investigate. Mr. Wehrman testified that he found almost no damage upstairs in the house that could be attributable to wind, e.g. no signs of roof uplift or misconnections of the rafters to the wall. He stated that in his opinion the absence of roof uplift precludes strong winds moving a home because strong winds create a negative pressure on the roof. He stated that only gravity and friction was holding this home down and that he found debris underneath the home. His inspection revealed no sign of tornado or structurally damaging wind. He also noted he found water marks inside the home, which indicated flooding.
Michael Rudolph Costelli testified as an expert in civil engineering with an emphasis in structural engineering. Plaintiffs retained his services to do a damage assessment on their home to determine the cause. He testified that when he visited the home on two occasions he found trees broken off near the top, as well as houses completely gone. He performed stability calculations, i.e., measuring applied forces to structures and their stability to them. The home had solid brick piers that were un-reinforced with no anchorage. The home was constructed in a fashion typical to that of the day in which it was built, i.e., 1920s. The mortar for the bricks would have lost some of the lime, rendering more of a sand matrix, weakening the piers. Based upon Mr. Costelli's calculations the direction (northwesterly) and distance (6-8 feet) of the movement of the home would have corresponded with the winds that were measured in the area due to Hurricane Katrina. He opined that the wind could have caused the home to lift up like a hovercraft and shift off the piers. Mr. Costelli also studied topographic maps of the area as well as the elevation of the Youngs' home and found it to be around 26 to 27 feet above sea level.
Stephen M. Wistar, a meteorologist employed by AccuWeather, testified as an expert concerning the weather related conditions of the area during Hurricane Katrina. He noted that all the official wind and storm-observing sites failed before the height of the storm, due to destruction or power failure. So, as a meteorologist, he turned to a state of the art model for *333 advanced circulation that uses the air pressure field and the wind field around the hurricane that runs over time and drives the storm surge. He explained that by running that model out over time, one can see how the wind patterns and the water heights change at frequent intervals. The data obtained was adjusted for certain non-scientific observations as well as different kinds of realtime data, such as high water marks. He also used the National Hurricane Center's published wind fields of Katrina. His research revealed that the highest wind speeds at the house site would have been 140 miles per hour and that the peak storm surge would have been 25 feet above sea level, and at that for only about an hour, before dropping back down to 20 feet. Mr. Wistar acknowledged that the level of storm surge affecting Pass Christian would have inundated the piers of the Youngs' home at some point during the hurricane's passing. However, he also testified that based on the Fujita Scale, a poorly constructed house could have moved with winds of 103 miles an hour.
Carl Joseph Heitzman, a life-long resident of Bay St. Louis and a general contractor, testified on behalf of the plaintiffs. Contrary to Mr. Wehrman, Mr. Heitzman testified that he had examined many of the homes in his neighborhood which were destroyed during Hurricane Katrina. He testified that it was the lack of what he found inside the Youngs' home, namely grass, debris, etc., that led him to conclude that their home was not damaged by flooding, so much as by wind. Mr. Heitzman offered a replacement cost of approximately $475,000.00, based upon a $175 per square foot estimate. After adjusting for skyrocketing prices post-Katrina, he totaled the cost to be $552,915.00 for the main home, excluding the garage and other building. Finally, he testified that the floors were not buckled, which was an occurrence he observed in other homes that had floated, and he observed no water line inside the house.
William Kimble, who lived down the block from where the Youngs' house once stood, testified by video deposition as a fact witness. He stayed in his home throughout the storm, and had 27 inches of water in his home. On cross examination though, plaintiffs' counsel brought to light that the Kimble home was about 2 feet lower in elevation compared with the Youngs' home.
Barry Keim, a climatologist, testified as an expert for USAA. According to Mr. Keim, the storm surge by the Youngs' home during Hurricane Katrina measured 26 feet and the sustained winds were only 95 miles per hour. Like Mr. Wistar, the Youngs' expert, Mr. Keim found that the level of storm surge affecting the area during the hurricane would have inundated the piers of the Youngs' home.
Mr. Donald F. Hemler, Jr., an employee of USAA, testified that he was the adjuster initially assigned to the Youngs' claim. He stated that he found water patterns inside the house. Moreover, the water patterns were "swirl marks." As a building constructor, he opined that if the water patterns had been formed by rain water coming through the roof, then the water marks would have been circular, not swirls. Mr. Hemler noted that he did not complete the adjustment of the claim because of a personal matter that required his return to Pennsylvania. On cross examination though, Mr. Hemler conceded that he initially thought the flood water level had reached the ceiling, a belief that later turned out to be incorrect. Also on cross, Mr. Hemler stated that USAA did not pay the Youngs the $35,000.00 in damages represented by the pool house, garage and fencing destroyed by wind for over a year because of his illegible handwriting. *334 Finally, he testified that had he stayed on this claim, he would have tried to resolve the two different reports between Jade Engineering and Mr. Costelli, instead of just accepting Jade's $17,000.00 estimate and payment that was made.
A general adjuster for USAA, Mr. Gary Taylor, testified on behalf of his employer. He handled the claim after Mr. Hemler left. He stated that he followed USAA's expert report from Jade Engineering, and simply sent a check to the Youngs for $17,329.22, which represented the replacement cost of the entire roofing system and ceilings in two rooms that Jade Engineering had stated were damaged by wind. Mr. Taylor admitted that he did this without ever visiting the Youngs' home because he believed he could rely on the paper documents before him. Later he learned that a garage, pool house, and shed were damaged too, but these were not included in the Jade Engineering report. Nonetheless, he stated that he relied on USAA's Jade Engineering report and disregarded the Costelli report because he felt his employer's report was more detailed. He also stated that due to a mistake he did not issue a check as per the insurance contract for 10% ($35,300.00) of the insured value of the structure ($353,000.00) for the loss of detached structures. He stated that he disregarded the Costelli and Heitzman reports because they calculated total replacement cost, and this did not pertain to wind damage.
On cross examination, Mr. Taylor conceded that when he closed the Youngs' claim on December 10, 2005, he had within his file notes from Mr. Hemler, the Costelli report and the Heitzman report (dated November 18, 2005) that indicated there were detached structures on the property. Mr. Young himself had told Mr. Hemler to return to the property to look for the garage and pool house. Nevertheless, Mr. Taylor testified he did not learn of these other structures until August of 2006, when USAA's counsel, Mr. Hemler and other USAA agents had a telephone conference preparing for this litigation. In his defense, Mr. Taylor stated he was overworked and had been assigned around 150-200 claims.
Clearly, the record before us contains fact and opinion testimony as well as documentary evidence from which the jury could reasonably conclude that the storm surge (water) during Hurricane Katrina caused significant damage to the Youngs' home. Also, the evidence was sufficient for the jury to return a dollar value reflecting the amount of damage it determined was caused by the wind and for which USAA is responsible to pay under the policy. Because the facts and inferences do not point so overwhelmingly in favor of the plaintiffs, we find that the trial court committed legal error when it rendered a JNOV under these facts.

DECREE
Accordingly, for the aforementioned reasons, we reverse the JNOV and reinstate the jury's verdict.
REVERSED.
NOTES
[1] The trial court rendered the JNOV on August 13, 2007. USAA filed a motion to reconsider the JNOV on August 22, 2007. Before the trial court considered the motion to reconsider, USAA filed a motion and order for suspensive appeal of the August 13, 2007 judgment, which the trial court granted on September 11, 2007. USAA's appeal was lodged in this Court on December 12, 2007, and designated as appeal no. 2007-CA-1590 C/W 2007-CA-1591. Meanwhile, the Youngs had filed a motion to dismiss USAA's motion to reconsider the JNOV, arguing that USAA had abandoned the motion to reconsider when it filed the appeal, citing Head v. Pendleton Memorial Methodist Hospital, 95-0461 (La.App. 4 Cir. 1/31/96), 669 So.2d 504. USAA opposed the motion to dismiss. Following a hearing, the trial court rendered a final judgment on January 3, 2008, dismissing USAA's motion to reconsider the JNOV, while reserving its right to appeal the August 13, 2007 judgment. Though appeal no. 2007-CA-1590 C/W 2007-CA-1591 had been lodged, out of an abundance of caution, on January 31, 2008, USAA filed a second motion for appeal, which the trial court granted. The second appeal was lodged on May 1, 2008 and designated as appeal no. 2008-CA-0543. The Youngs filed a motion to dismiss the second appeal or, alternatively, to consolidate the appeals. In the interest of judicial economy, we hereby consolidate appeal nos. 2007-CA-1590 C/W 2007-CA-1591 with 2008-CA-0543.
[2] After considering a motion for partial summary judgment filed by USAA on the issue of whether the substantive law of Mississippi or Louisiana applied to the case, the trial court rendered a judgment on December 8, 2006, holding that Mississippi law applied as Mississippi had a more substantial interest in regulating insurance contracts issued on Mississippi property.